**THE BULLEN COMPANIES,**
Petitioner

v.

**WORKERS' COMPENSATION APPEAL BOARD (HAUSMANN), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 22, 2008.
Decided Oct. 23, 2008.
Reargument Denied Dec. 8, 2008.

John F. Hayes, II, Blue Bell, for petitioner.

Alfred J. Carlson, Philadelphia, for respondent.

BEFORE: SMITH–RIBNER, Judge, and SIMPSON, Judge, and KELLEY, Senior Judge.

OPINION BY Judge SMITH–RIBNER.

The Bullen Companies (Employer) seek review of an order of the Workers' Compensation Appeal Board (Board) that affirmed the decision of the Workers' Compensation Judge (WCJ) awarding total disability benefits to Michael Hausmann (Claimant). Employer questions whether the WCJ erred in finding that Claimant satisfied the requirements of Section 311 of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 631, with respect to the time for giving Employer notice of his injury and in finding that Claimant met his burden of proving that he suffered a compensable occupational disease due to chemical exposure during his employment. It also asserts that the WCJ's decision was not "reasoned" within the requirements of Section 422(a), 77 P.S. § 834.

I

Claimant testified that he worked for 17 years at Employer's Malvern plant where it manufactured cleaning products by mixing solvents (ethylene butyl glycol ether, alcohols and soaps) with other products in large tanks that were open at the top. His duties included mixing the solvents and slowly adding them to the tanks while their contents were agitated. After a product was made, Claimant pumped it into a holding tank and rinsed the mixing tanks to make them ready for the next batch. Employer did not provide him with any ventilator, mask or other breathing protection so he inhaled the fumes during the performance of these duties. Sometime solvents splashed onto Claimant's skin. In late 2001 he began to experience frequent urination and to see doctors and stopped working on June 1, 2002 when Employer closed the plant and he was laid off. In the last two weeks of employment

he had to clean the tanks repeatedly until the solvents no longer could be smelled. In July 2002 he was referred to a kidney specialist who recommended a kidney transplant, and he began receiving dialysis, taking many medications and having frequent blood work. He also suffers anemia, gout and fatigue.

Claimant suspected by late 2002 that his kidney condition was related to his employment and retained an attorney to secure a medical expert to determine if that was so. In July 2004 he notified Employer that he had sustained a work injury in May 2002, and he filed a claim petition stating that he had sustained an occupational disease by virtue of exposure to chemicals, although his then attorney still had not secured a medical expert. He first learned that his kidney problems were work related in March 2005 from Arthur L. Frank, M.D., board certified in internal and occupational medicine and Chairman of the Drexel University School of Health, Department of Environmental and Occupational Health.

Dr. Frank testified by deposition that Claimant was suffering from a type of glomerulonephritis, a disease that interferes with the straining of harmful materials from the blood by parts of the kidneys known as glomeruli, and that it is a chronic disease that is not expected to improve. Dr. Frank further testified as to occupational medicine literature that indicated it had long been known that solvents such as the ones to which Claimant had been exposed over 17 years can cause glomerulonephritis and opined to a reasonable degree of medical certainty that Claimant's glomerulonephritis was related to his solvent exposure at work.

In opposition to the claim petition, Employer submitted the deposition testimony of Richard A. Friedman, M.D., board certified in internal medicine and nephrology (a subspecialty dealing with kidneys). Dr. Friedman testified that the specific type of glomerulonephritis with which Claimant had been diagnosed is membranoproliferative glomerulonephritis, which can result from idiopathic causes, meaning that the disease arises spontaneously or from a cause that cannot be identified. He further testified that while there is documentation that exposure to toxic chemicals can cause kidney disease, there is no documented scientific literature that indicates that toxic chemicals can cause a glomeruli-type kidney disease. He opined that Claimant's exposure to chemicals at his place of employment did not cause his membranoproliferative glomerulonephritis.

The WCJ credited Claimant's testimony. He also found Dr. Frank's testimony more persuasive and credible than Dr. Friedman's as to work-related causation, noting that Dr. Frank is board certified in occupational medicine and had cited a number a studies and articles documenting that exposure to solvents can cause membranoproliferative glomerulonephritis. In contrast, Dr. Friedman had never been called as an expert in the field of occupational medicine, and he admitted that he is not familiar with occupational health literature and did not review any occupational medicine textbooks prior to testifying but rather had limited his research to nephrology textbooks and literature. The WCJ further noted Dr. Frank's testimony that unlike the occupational medicine literature that he consulted, which is concerned with and addresses the causes of disease, Dr. Friedman consulted internal medicine texts that do not focus on causes of disease.

The WCJ found that a preponderance of occupational health literature supports the relationship of Claimant's kidney condition to his exposure to toxic chemicals in his employment. The WCJ determined that

Claimant had developed membranoproliferative glomerulonephritis as a result of his 17–year exposure to solvents and granted Claimant's claim petition. The Board affirmed the WCJ's ruling, concluding that it was based upon substantial competent evidence both as to the relationship between Claimant's disease and the chemicals to which he was exposed in his job and the timeliness of Claimant's notice of his injury, and further concluding that the WCJ met the "reasoned" decision requirement.

Employer principally argues that Claimant's petition should have been denied because the notice Claimant gave of his injury was not timely under Section 311 of the Act. It alternatively contends that the WCJ's written explanation of his ruling did not constitute a "reasoned decision" as required by Section 422(a).[1]

Section 311 provides in relevant part:

> Unless ... the employe ... shall give notice [of the injury] to the employer ... within one hundred and twenty days after the occurrence of the injury, no compensation shall be allowed. However, in cases of injury resulting from ionizing radiation or any other cause in which the nature of the injury or its relationship to the employment is not known to the employe, the time for giving notice shall not begin to run until the employe knows, or by the exercise of reasonable diligence should know, of the existence of the injury and its possible relationship to his employment. The term "injury" in this section means, in cases of occupational disease, disability resulting from occupational disease.

Employer argues that Claimant's notice was not given within 120 days because he alleged in his claim petition that the disease was contracted in May 2002 but notice was not given until July 2004. As to the "discovery" clause in the second sentence of Section 311, Employer accepts that for "occupational diseases" encompassed by Section 301(c)(2),[2] 77 P.S. § 411(2), which are latent, case law has established that the 120–day notice period begins to run when a doctor advises that the claimant is permanently disabled by a disease and that it is related to the claimant's work. Employer argues that this rule does not apply here because Claimant's disease is encompassed by Section 301(c)(1), 77 P.S. § 411(1),[3] and in support cites *Price v. Workmen's Compensation Appeal Board (Metallurgical Resources)*, 533 Pa. 500, 626 A.2d 114 (1993), along with *Gaff v. Workmen's Compensation Appeal Board (Babcock & Wilcox)*, 140 Pa. Cmwlth. 330, 592 A.2d 827 (1991), but neither case dealt with when Section 311's notice period begins to run for injury under Section 301(c)(1).[4]

---

1. The Court's review is limited to determining whether constitutional rights were violated, an error of law was committed, a practice or procedure of the Board was not followed or the findings of fact are not supported by substantial evidence in the record. *Peterson v. Workers' Compensation Appeal Board (Wal Mart)*, 938 A.2d 512 (Pa.Cmwlth.2007).

2. Section 301(c)(2) encompasses "occupational diseases" as defined and enumerated in Section 108 of the Act, 77 P.S. § 27.1, including silicosis, asbestosis, hepatitis and so forth.

3. Section 301(c)(1) defines "injury" as any injury to an employee arising in the course of employment and related thereto and such disease or infection naturally resulting from the injury, which has been held to include diseases not encompassed by Section 301(c)(2). *See, e.g., Brockway Pressed Metals v. Workers' Compensation Appeal Board (Holben)*, 948 A.2d 232 (Pa.Cmwlth.2008). Claimant does not dispute that his disease is encompassed by Section 301(c)(1).

4. In *Price* the Supreme Court clarified two issues: when does the limitations period under Section 315, 77 P.S. § 602, begin to run for total disability claims under occupational disease provisions of Section 301(c)(2), and

## II

The Pennsylvania Supreme Court directly addressed the question of when the notice period begins to run for a disease encompassed by Section 301(c)(1) in *Sell v. Workers' Compensation Appeal Board (LNP Eng'g)*, 565 Pa. 114, 771 A.2d 1246 (2001). Sell, who had been a smoker for more than 40 years, became a tester of a plastic product in 1988, having daily and direct contact with chemical fumes. She began to experience throat and lung problems which she believed were job related, but, lacking proof, she did not advise her employer of her belief. In November 1992 she was admitted to a hospital and was told that she had emphysema but was not told of its cause. Upon discharge, she searched for a doctor with knowledge of the chemicals in her work environment but did not locate one until August 1993. The doctor advised that exposure to chemicals at her work had exacerbated her emphysema. In August 1993 she gave notice of her illness.

The WCJ granted Sell's claim petition, finding that the notice of injury was timely because, prior to her doctor informing her, she did not know nor have reason to know that her illness had been aggravated by the chemicals at work. The Board reversed, concluding that her August 1993 notice was not timely because she knew or should have known of the nature of her injury and its relationship to her employment in November 1992 when she was hospitalized. A divided panel of this Court, in an unpublished opinion, affirmed the Board.

The Supreme Court reversed this Court's order in *Sell* and reinstated the WCJ's order granting the claim petition. The Supreme Court held that Section 311's discovery rule "calls for more than an employee's suspicion, intuition or belief; by its terms, the statute's notice period is triggered only by an employee's knowledge that she is injured and that her injury is possibly related to her job." *Id.*, 565 Pa. at 126, 771 A.2d at 1253. The court reasoned as follows:

When read in its entirety, the record establishes that at the time Sell's emphysema was diagnosed, she was a layperson who thought that the formaldehyde in her work environment was harmful. Aware that she held an uninformed view, Sell sought out an expert who could tell her whether she was correct to think so. In the exercise of reasonable diligence, and with notable persistence, Sell located Dr. Cohn, a physician who confirmed her suspicions about formaldehyde and informed her on August 31, 1993 that exposure to the chemical exacerbated her emphysema. As the WCJ found, it was at this point, with a medical diagnosis in hand, that Sell had the knowledge that [Section 311] requires. To hold otherwise would, in our view, disregard the substantial evidence that supported the WCJ's finding, and violate the well-settled principles that mandate a remedially-minded application of the Act and a strict interpretation of [Section 311's] language.

Thus, we uphold the WCJ's finding that the 120–day notice period of [Section 311] did not begin to run until Sell

---

when is the claimant charged with knowledge of such disability. It reiterated that the statute begins to run on such claims when a claimant knows or should know that he/she suffers total disability due to an occupational disease and that discovery of such condition first occurs when a competent medical diagnosis is made known to a claimant. Although *Gaff* did address the issue of when Section 311's notice period begins to run, it too involved a Section 301(c)(2) occupational disease (asbestosis) and did not address when the 120–day period begins to run for disease encompassed by Section 301(c)(1).

received a medical diagnosis of her work-related injury on August 31, 199[3]. . . .

*Id.*, 565 Pa. at 126–127, 771 A.2d at 1253.

■ The record in this case fully supports the WCJ's finding that Claimant did not know that his disease was job related until Dr. Frank so advised him in March 2005. Employer's contention to the contrary is based solely on Claimant's testimony that he suspected in 2002 that his kidney problem was related to his job. As the Supreme Court held in *Sell*, however, Section 311's discovery rule requires more than an employee's suspicion, intuition or belief.

■ Employer next argues that the WCJ failed to issue a "reasoned" decision with respect to the timeliness of Claimant's notice of injury. Its argument is predicated upon the WCJ not having made specific findings or conclusions on when and how Claimant gave notice of his specific disease, of a causal relation to his job and of his resultant disability. As already discussed, the 120–day period for Claimant to give notice began to run in March 2005 when Dr. Frank advised him that his disease was job related. Within that 120–day period Employer received Dr. Frank's report and Claimant testified in full and was cross-examined by Employer's counsel. Thus the record shows beyond question that within the 120–day period, Employer had received notice and all of the information to which it was entitled.[5] In *Daniels v. Workers' Compensation Appeal Board (Tristate Transp.)*, 574 Pa. 61, 76, 828 A.2d

1043, 1052 (2003), the Supreme Court explained that "a decision is 'reasoned' for purposes of Section 422(a) if it allows for adequate review by the WCAB without further elucidation and if it allows for adequate review by the appellate courts under applicable review standards." The WCJ's decision meets this standard.

■ Employer's final argument is that there is neither sufficient support in the record nor a "reasoned decision" regarding a causal link between Claimant's disease and his job. It contends that although Dr. Frank viewed Claimant's disease as glomerulonephritis, it was determined from a later biopsy that the actual disease was membranoproliferative glomerulonephritis, and there purportedly is neither evidence as to a causal link between membranoproliferative glomerulonephritis and Claimant's job nor findings addressing these purportedly critical matters.

Employer's arguments ignore Dr. Frank's opinion, rendered within a reasonable degree of medical certainty, that Claimant's chronic renal failure or membranoproliferative glomerulonephritis is related to his exposure to solvents. He testified that glomerulonephritis and membranoproliferative glomerulonephritis are the same disease, that at least one of the articles he cited discussed proliferative glomerulonephritis and membranous glomerulonephritis being caused by solvents and that when medical literature documents a causal connection between solvent exposure and glomerulonephritis, by definition it documents a causal connection

---

5. In *B.P. Oil Co. v. Workmen's Compensation Appeal Board (DeFrank)*, 158 Pa.Cmwlth. 8, 632 A.2d 585 (1993), the claimant filed his occupational disease claim prior to learning from his physician that his injury was work related, and the record supported the finding that he was unaware of such injury until so advised by his physician. The Court stated that the claimant filed his petition within the Act's time requirements, and it also concluded that, while unusual, the timing of the filing of the petition was insignificant and that the early notice did not affect the fulfillment of the statutory time requirements of Section 311 or of Section 315.

**494**

between solvent exposure and membrano-proliferative glomerulonephritis.[6]

The WCJ has exclusive province over questions of credibility and evidentiary weight and is free to accept or to reject the testimony of any witness in whole or in part, even medical witnesses. *General Electric Co. v. Workmen's Compensation Appeal Board (Valsamaki),* 140 Pa. Cmwlth. 461, 593 A.2d 921 (1991). The Court's function is to determine whether the WCJ's findings of fact are supported by substantial evidence of record, *see Peterson,* and in reviewing a WCJ's decision the Court must consider the evidence in a light most favorable to the party who prevailed before the WCJ. *Shop Vac Corp. v. Workers' Compensation Appeal Board (Thomas),* 929 A.2d 1236 (Pa.Cmwlth. 2007).

After a careful review of the record in this matter, the Court concludes that the WCJ's findings of fact are supported by substantial evidence of record, including *inter alia* the credited testimony from Claimant and his medical witness, Dr. Frank, which establishes the causal connection between Claimant's disease and his employment. Moreover, the Court determines that Claimant satisfied statutory notice requirements and that the evidence, when viewed in a light most favorable to the prevailing party, supports the conclusion that Claimant met his burden to prove that he suffered a compensable occupational kidney disease caused by his exposure to solvents during his employment with Employer.

Judge SIMPSON concurs in the result only.

6. Employer contends that it is entitled to an adverse inference by virtue of Claimant's failure to call his treating physicians. The Court rejects this contention and directs Employer to *Marriott Corp. v. Workers' Compensation Appeal Board (Knechtel),* 837 A.2d 623 (Pa. Cmwlth.2003) (holding that employer was not entitled to adverse inference where claimant failed to call her treating doctor to establish causal connection between her work injury and psychic condition as the doctor was not solely within the reach and knowledge of claimant).

*ORDER*

AND NOW, this 23rd day of October, 2008, the order of the Workers' Compensation Appeal Board is affirmed.